UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DIANA WHEELER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 4:13-CV-145-JCH-SPM |
| | ) | |
| | ) | |
| CAROLYN W.  COLVIN,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, denying the

applications of Plaintiff Diana Wheeler for Disability Insurance Benefits ("DIB") under Title II

of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income

("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act").  This

matter was referred to the undersigned United States Magistrate Judge for review and a

recommended disposition pursuant to 28 U.S.C. § 636(b).  The undersigned recommends that the

decision of the Commissioner be reversed and the case remanded for further proceedings.

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on July 15, 2009 and January 19, 2010 respectively.

(Tr. 202-08).  She alleged that she had been unable to work since January 1, 2008.  (Tr. 205).  In

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should
therefore be substituted for Michael J. Astrue as the defendant in this case.

her Disability Report, she alleged disability due to diabetes, anxiety, severe depression, thyroid problems, and sleeping problems. (Tr. 229). Both applications were initially denied. (Tr. 77-81). On October 5, 2010, Plaintiff filed a Request for Hearing by Administrative Law Judge (ALJ). (Tr. 85-89). On April 10, 2012, the ALJ issued an unfavorable decision. (Tr. 5-22). Plaintiff filed a Request for Review of Hearing Decision with the Social Security Administration's Appeal's Council on April 23, 2012, but the Council declined to review the case on December 11, 2012. (Tr. 1-4). Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## II.     FACTUAL BACKGROUND

### A. PLAINTIFF'S TESTIMONY BEFORE THE ALJ

Plaintiff was born on July 9, 1962. (Tr. 75). On September 29, 2011, Plaintiff testified before the ALJ. She testified that she had completed the tenth grade and does not have a GED. (Tr. 26). She last worked from 2008 to 2009 as a general cook and certified medical aid (CMA); prior to that, she worked as a general cook and grill cook. (Tr. 26-29).

Plaintiff stopped working due to her back pain, which is constant and is at an 8 or 9 on a scale of 1 to 10. (Tr. 30, 42). She can sit for about 30 minutes at a time; can stand for about 15 minutes at a time; can stoop for a few minutes; cannot climb; cannot walk a block without back pain; and has been advised to lift not more than 10 pounds. (Tr. 38-39).

Plaintiff has diabetes that has been controlled by insulin, medication, and diet for the last month and a half. (Tr. 31, 36-37). Previously, she had been taken to the emergency room for very high blood sugar on three occasions. (Tr. 37). Plaintiff reported that she had seen "the diabetic and endocrinologists" in Columbia in 2010 and/or 2011.

Plaintiff had eye surgery at the Mason Eye Clinic at University Hospital on August 25, 2011, after she "suddenly went blind in [her] left eye and had barely any vision in [her] right." This was related to her diabetic neuropathy. At the time of the hearing, she could not see out of her left eye and had 20/70 vision in her right; she could not see well enough to read recipes or directions. (Tr. 33, 35, 37). Her eye doctor had told her not to lift more than ten pounds due to "the pressure." (Tr. 38). Plaintiff had an upcoming appointment to decide whether to do another surgery or let her eyes heal on their own. (Tr. 33). She did not yet have any sort of correction for her right eye; she stated that they were "still working on it." She indicated that they were "trying to do something with the left eye, too," though they have not guaranteed her any of her sight back. (Tr. 40).

Plaintiff has hypothyroidism. Her thyroid was removed in 2010 or 2011 at University Hospital in Columbia, Missouri, and she takes a thyroid pill. (Tr. 35).

Plaintiff had recent gallbladder surgery at St. Mary's in Jefferson City and bladder surgery at University Hospital in Columbia. (Tr. 32-33).

Plaintiff also has neuropathy in her feet and legs, high blood pressure (for which she takes medication), COPD, and stabbing pain in her left hip (for which she has not yet received treatment). (Tr. 34, 41-42).

At the time of the hearing, Plaintiff was not receiving regular psychological care. (Tr. 33). She continues to experience depression and anxiety and takes medication for both. However, they are controlled by the medication "for the most part." (Tr. 35-36).

At the end of the hearing, the ALJ pointed out to Plaintiff's hearing-level counsel that Plaintiff's testimony indicated that she had gone through extensive medical treatment throughout the last year and a half (approximately March 2010 through October 2011), but that the record

lacked any evidence of that treatment. (Tr. 47-50). The ALJ stated that the missing records "make [] it impossible for me to—to fully evaluate Ms. Wheeler's claim." (Tr. 48). In a follow-up letter dated December 28, 2011, the ALJ indicated that records were missing from seven sources: (1) Mason Clinic, (2) Columbia Clinic, (3) An orthopedist in Jefferson City, (4) Dr. Daugherty in Belle, Missouri; (5) Dr. Obermark in Belle, Missouri; (6) University Hospitals and Clinics; and (7) St. Mary's Hospital. (Tr. 264).

After the ALJ followed up with Plaintiff's hearing-level counsel in two letters, it appears that the ALJ was ultimately provided with most of the documents he identified as missing, including documents from each of the seven categories he identified.[2] (Tr. 264-66, 693-94). However, the record still appears to lack records of Plaintiff's thyroid and bladder surgeries at University Hospital, her gallbladder surgery at St. Mary's, some records of emergency room visits she mentioned to her primary care physician, and the visits to endocrinologists in Columbia that she mentioned.

### B. RECORDS OF TREATING SOURCES

#### 1. RECORDS OF ST. MARY'S HEALTH CENTER (JULY 2009)

On July 13, 2009, Plaintiff was admitted to St. Mary's Medical Health Center ("St. Mary's"), reporting increased paranoia, mood fluctuations, and being unable to maintain her medications. (Tr. 274, 279). Her mood was depressed, and she had vague homicidal ideation, stating, "I may hurt somebody, I don't know who." She was diagnosed with major depressive disorder, recurrent with anxiety, rule out underlying bipolar affective disorder type 2; cluster B

---

[2] The ALJ's final (and unanswered) letter to Plaintiff's counsel indicated that he was still missing records from the Mason Clinic, from Dr. Daugherty, and from the Columbia Clinic. However, Plaintiff's hearing-level counsel indicated in a letter to the ALJ that Dr. Daugherty's records were included in the St. Mary's records and that the Mason Clinic and Columbia Clinic documents were part of the University Hospitals and Clinics records. (Tr. 693-94). These assertions are supported by the record.

personality traits; insulin-dependent diabetes mellitus; and hypothyroidism. She was assigned a

Global Assessment of Functioning (GAF) score of 35.[3] While hospitalized, Plaintiff was also

treated for severe glucose toxicity, low back pain, hyperglycemia, and type II diabetes. (Tr. 276-

78). She was prescribed Vistaril[4] as needed for anxiety, Celexa,[5] trazodone,[6] and a short-term

course of Klonopin[7] during her hospitalization. (Tr. 281). She was discharged on July 17, 2009,

with a GAF of 55.[8] (Tr. 288).

_____

[3] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th ed. 1994).

A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoid friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV 32.

[4] Vistaril is a brand name for hydroxyzine. It is used to treat anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682866.html.

[5] Celexa is a brand name for citalopram. It is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html.

[6] Trazodone is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html.

[7] Klonopin is a brand name for clonazepam. It is used to treat panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html.

[8] A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV 32.

## 2. RECORDS OF PATHWAYS COMMUNITY BEHAVIOR HEALTH CARE (JULY - NOVEMBER 2009)

Plaintiff was first assessed at Pathways Community Behavior Health Care on July 21, 2009. (Tr. 275, 304). She was assigned a GAF of 45.[9] (Tr. 303). On August 27, 2009, Plaintiff was diagnosed with major depressive disorder (recurrent), generalized anxiety disorder, and panic disorder. (Tr. 307). It was noted that Plaintiff was experiencing delusion and auditory hallucinations, and she was assigned a GAF of 50. (Tr. 311-12). On September 2, 2009, Plaintiff was again assigned a GAF of 50. (Tr. 307-08).

On October 8, 2009, Plaintiff reported that she was "doing much better now" and that her depression was "much better." (Tr. 313). On November 12, 2009, Plaintiff again reported that she was "doing much better." (Tr. 314). These records are largely illegible, but it appears that various medications were prescribed or continued. (Tr. 313-14).

## 3. RECORDS OF PHELPS COUNTY MEDICAL CENTER (DECEMBER 2009)

Plaintiff went to Phelps County Medical Center ("Phelps") on December 16, 2009, reporting that her blood sugar had been in the 300s to 400s for the past two weeks. Plaintiff reported partial compliance with her medications due to insurance issues. (Tr. 325).

Plaintiff returned to Phelps on December 24, 2009. She reported generalized weakness, headaches, confusion, abdominal pain, anxiety, depression, and problems urinating. (Tr. 316). Attending physicians noted elevated blood sugar, shortness of breath, possible stroke, altered mental status, lethargy, and confusion. A chest x-ray and CT of Plaintiff's brain revealed no significant findings. (Tr. 322-23).

---

[9] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* 32.

### 4. *RECORDS OF TREATING PHYSICIAN JAMES W. KEITH, M.D. (2004-2010)*

James W. Keith, M.D. treated Plaintiff on several occasions from 2004 to 2010 for problems including limb swelling, back pain, high blood sugar, neuropathy, obesity, anxiety, and hypothyroidism. (Tr. 332-384). Records predating Plaintiff's alleged onset date of January 1, 2008, show that Plaintiff was treated for diabetes, high blood sugar, thyroid issues, back pain, and other conditions. (Tr. 339-64, 379-84).

On January 25, 2010, Dr. Keith noted that Plaintiff had diabetic neuropathy and that she was being treated for anxiety and depression with Celexa, Librium,[10] and trazodone. (Tr. 336). On February 19, 2010, Dr. Keith noted that Plaintiff's diabetes had been under poor control for a long period of time. (Tr. 333). On February 25, 2010, Plaintiff reported a swollen abdomen, leg swelling, and cough. Dr. Keith noted that Plaintiff had gained 15 pounds in the last week and was very short of breath with exertion. (Tr. 332).

### 5. *RECORDS OF RICHARD DAUGHERTY, M.D. (2003, 2010-11)*

Records indicate Plaintiff first saw Richard Daugherty, M.D., in 2003. Records from 2003 indicate that Plaintiff had a history of diabetes, hypothyroidism, hyperlipidemia, and peripheral edema. (Tr. 477).

Throughout 2010 and 2011, Dr. Daugherty and a nurse practitioner in Dr. Daugherty's office, Shannon Wright, treated Plaintiff for COPD, peripheral edema, reflux, anxiety, depression, panic disorder, thyroid disorder, uncontrolled diabetes mellitus with neuropathy, left shoulder tendonitis, degenerative disc disease, and foot problems. (Tr. 385-415, 461-665).

---

[10] Librium is a brand name for chlordiazepoxide. It is used to treat anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682078.html.

On March 9, 2010, Dr. Daugherty noted Plaintiff had Hashimoto thyroiditis and would follow up with an endocrinologist in June, had left flank pain, and had shortness of breath. (Tr. 473).

On March 15, 2010, an abdominal ultrasound indicated Plaintiff had a fatty infiltrated liver, a contracted gallbladder, and an enlarged right kidney. (Tr. 388). A pulmonary function test revealed a mild obstructive airway defect. (Tr. 389).

On March 18, 2010, Plaintiff reported a knot and pain on the bottom of her right foot. (Tr. 398). A radiology report confirmed hammertoes on the right foot. (Tr. 398, 565). However, Plaintiff did not want to have a podiatry evaluation because she had more urgent issues, including probable impending abdominal surgery. (Tr. 399).

On March 22, 2010, an abdominal ultrasound revealed kidney abnormalities, fatty changes of the liver, and old granulomatous disease. (Tr. 385). Dr. Daugherty noted that Plaintiff was to follow up with a general surgeon for her gallbladder issues and was proceeding with further evaluation by urologist. (Tr. 395).

On April 5, 2010, Plaintiff reported worsening abdominal pain and weight gain. (Tr. 392). Shannon Wright, APRN, BC, FNP sent her to the ER for evaluation management. (Tr. 392-93).

On June 24, 2010, Plaintiff presented with ongoing dysuria and ongoing flank pain. Her extremities showed no edema. (Tr. 587)

On July 8, 2010, a thyroid ultrasound revealed moderate enlargement of both lobes of the thyroid. The record noted a history of goiter, Hashimoto thyroiditis, and dysphagia. (Tr. 560).

On July 16, 2010, Dr. Daugherty diagnosed uncontrolled diabetes mellitus and peripheral edema. For her anxiety and depression, he increased her Ativan (lorazepam) and continued her Celexa. (Tr. 585).

On July 26, 2010, Dr. Daugherty's office sent Plaintiff to the St. Mary's emergency room. Plaintiff's chief complaints were lower extremity edema, back pain, and hyperglycemia. Notes indicate that she had had low back pain for three days, radiating down her left leg. (Tr. 486). Lumbar spine X-rays demonstrated mild degenerative changes but no acute fractures or malalignment. Plaintiff's glucose was 101, her thyroid-stimulating hormone was in the normal range, her renal function was normal, and her liver function tests were normal. (Tr. 488). An ultrasound of Plaintiff's pelvis was unremarkable. (Tr. 545). Lumbar spine X-rays indicated mild degenerative changes. (Tr. 488). The record noted that Plaintiff's diabetes seemed much better controlled than it had been and that the changes Dr. Daugherty had been making were markedly improving her control. Plaintiff was diagnosed with edema, lumbar pain, and diabetes mellitus. Plaintiff was prescribed Lasix,[11] Vicodin, and Flexeril.[12] (Tr. 489).

On July 27, 2010, an MRI of Plaintiff's lumbar spine showed mild to moderate lumbar spine spondyloarthropathy and discogenic disease. (Tr. 479-480).

On July 28, 2010, Dr. Daugherty noted that Plaintiff had some discomfort and decreased range of motion in her torso secondary to back pain. (Tr. 578).

---

[11] Lasix is a brand name for furosemide, a "water pill" used to reduce swelling and fluid retention. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682858.html.

[12] Flexeril is a brand name for cyclobenzaprine and is a muscle relaxant. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html.

On August 3, 2010, Dr. Daugherty noted that she continued to have some chronic back pain but was doing better with Flexeril and Vicodin.[13]  It was noted that she had had resolution of her peripheral edema with Lasix.  (Tr. 575).  She continued to have mild abdominal pain.  (Tr. 576).

On August 5, 2010, Plaintiff reported that her blood glucose levels had been running in the 300 to 400 range.  (Tr. 572).  Plaintiff noted that she had been scheduled with GI for EGD and colonoscopy on August 25, 2010.  (Tr. 572-73).

On August 30, 2010, Plaintiff reported chronic back pain.  (Tr. 609).  Dr. Daugherty assessed uncontrolled diabetes, bronchitis/COPD, and gastroesophageal reflux disease.  (Tr. 609-10).  Plaintiff reported that she had an endocrinology specialist exam scheduled for September 1, 2010 and a GI specialist evaluation scheduled for September 8, 2010.  (Tr. 609).

On September 14, 2010, Plaintiff reported some chronic back pain that had been slightly worse over the last couple of weeks.  (Tr. 604).  Dr. Daugherty diagnosed lumbosacral back pain and prescribed hydrocodone and lorazepam.  Dr. Daugherty noted some increased anxiety but no significant depression.  He reported that she had uncontrolled diabetes but was "doing better overall."  (Tr. 605).

On September 30, 2010, Plaintiff again reported lumbosacral back pain and anxiety issues.  However, she stated that both of those issues were doing better with the treatment given at the last visit.  (Tr. 600).

On October 18, 2010, Plaintiff reported mild shortness of breath and some increased back pain.  (Tr. 597).  Dr. Daugherty noted that she had chronic lumbosacral back pain and would

---

[13] Vicodin is a brand name for a combination of acetaminophen and hydrocodone and is used to relieve moderate to severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html.

have lumbosacral X-rays soon. She was also advised to call her endocrinologist for adjustment of her diabetes medication. (Tr. 598).

On November 1, 2010, Plaintiff reported worsening back pain and continued peripheral edema. She reported that Vicodin, Flexeril, and Neurontin[14] did seem to help. It was noted that recent X-rays were unremarkable. (Tr. 594). Dr. Daugherty diagnosed lumbosacral back pain with bilateral sciatica symptoms and prescribed Neurontin, Vicodin, and Flexeril. (Tr. 594-95). He stated that she should not lift more than 10 pounds; should do no repetitive bending, twisting, or turning motion; and should "continue RICE[15] and restrictions." It was noted that she was scheduled for thyroid surgery on November 18, 2010. (Tr. 595).

On December 14, 2010, Plaintiff reported that she had undergone a total thyroidectomy on November 18, 2010 and that she was following up with Dr. Zitch. Dr. Daugherty noted that she continued to have a moderate amount of lumbosacral back pain with bilateral sciatica symptoms and was having difficulty with pain control. (Tr. 591). She was prescribed Norco.[16] (Tr. 592).

On December 23, 2010, Plaintiff reported she had recently been seen by urologist Dr. Einstein, who started her on medications for neurogenic bladder. (Tr. 589).

On December 29, 2010, an MRI of Plaintiff's lumbar spine revealed generalized posterior disc bulging at L5-S1 level with very mild central broad-based disc protrusion, similar to a

---

[14] Neurontin is a brand name for gabapentin, which is used to treat seizures and certain types of pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html.

[15] RICE likely stands for "Rest, Ice, Compression, and Elevation."

[16] Norco is a brand name for a combination of acetaminophen and hydrocodone; it is used to relieve moderate to severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html.

previous exam done on July 27, 2010. The scan also revealed mild posterior disc bulging at L4-L5 level. (Tr. 552).

On January 17, 2011, Plaintiff reported that she had gone to the emergency room the day before due to severe back pain. (Tr. 662). Dr. Daugherty refilled her Percocet[17] and diazepam,[18] told her to continue RICE and restrictions, and instructed her to lift no more than 10 pounds and to avoid repetitive bending, twisting, and turning motions. (Tr. 663).

On January 24, 2011, Plaintiff's medications for back pain were refilled. It was noted that she was "having much better pain control overall." (Tr. 660).

On March 9, 2011, Plaintiff reported continuing leg and back pain. Dr. Daugherty noted that she was "having adequate pain control." However, he also stated she was to "continue with current RICE and restrictions as well as pain control," that she was "to avoid lifting greater than 10 pounds," that she should "avoid repetitive, bending, twisting, turning motions" and that they would proceed with further evaluation through the pain clinic. (Tr. 653).

On March 9, 2011, Dr. Daugherty completed a form so that Plaintiff could obtain diabetic shoes. (Tr. 455-60, 654). He reported that Plaintiff suffered from diabetic neuropathy with evidence of callus formation. (Tr. 456).

On May 4, 2011, Plaintiff reported left shoulder pain that began about a month prior and difficulty with range of motion of the arm. She stated that the pain got up to 10/10 and that she took Percocet to dull the pain. An X-ray of Plaintiff's shoulder showed no abnormalities. (Tr. 549). Dr. Daugherty ordered an MRI and range of motion exercises to prevent frozen shoulder

---

[17] Percocet is a brand name for a combination of acetaminophen and oxycodone; it is used to relieve moderate to severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html.

[18] Diazepam is used to relieve anxiety and muscle spasms.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682047.html.

and stated that she was to do no lifting with that arm and no repetitive bending, twisting, or turning motions until the MRI was reviewed. (Tr. 651).

On June 6, 2011, Plaintiff reported chest tightness, shortness of breath, and pain in the left shoulder that was "up to 10/10 at times." (Tr. 648). She was diagnosed with COPD/bronchitis, asthma, chest pain, and left shoulder pain/probable rotator cuff injury, and it was noted that she would have an MRI. (Tr. 649).

On June 21, 2011, Plaintiff presented with some mild discomfort of the abdomen, feet, and legs from swelling. She also had chronic lumbosacral back pain but was "having good pain control at this time." She also had left shoulder pain. Dr. Daugherty noted that she should "continue with RICE restrictions and current treatment"; that her anxiety/depression was "well-controlled"; and that she had left shoulder pain, awaiting MRI. He noted that her anxiety and depression were "well controlled." (Tr. 645). He also noted that she had hypothyroid/hyperlipidemia/uncontrolled diabetes mellitus with neuropathy and was to see an endocrinologist in the near future. (Tr. 646).

On July 7, 2011, Dr. Daugherty noted that Plaintiff had mild peripheral edema that was "significantly improved." He also noted that she had "intermittent chest pain/left shoulder pain" that would be monitored. (Tr. 643). Dr. Daugherty noted left shoulder pain/probable rotator cuff injury. He stated that Plaintiff should avoid overuse and should continue with attempts at a general range of motion. (Tr. 642).

On July 13, 2011, an MRI of Plaintiff's left shoulder revealed (1) small to moderate joint effusion with evidence of synovial hyperplasia and inflammation in the axillary pouch; findings also suggest capsulitis; (2) mild to moderate tendonosis of the anterior supraspinatus tendon; and

(3) increased signal along the superior undersurface of the subcapularis tendon, suggestive of tendonosis versus partial undersurface tear.  (Tr. 546).

On July 15, 2011, Plaintiff reported left shoulder complaints to Nurse Wright, and it was noted that she should see an orthopedist.  (Tr. 639-40).  Nurse Wright also noted that Plaintiff was experiencing pelvic pain and that she should undergo a pelvic ultrasound.  The record noted that Plaintiff possibly needed referral back to the surgeon who performed her bladder repair due to ongoing discomfort.  (Tr. 640).

### 6.  RECORDS OF JEFFERSON CITY MEDICAL GROUP – ORTHOPEDICS AND SPORTS MEDICINE (JULY - DECEMBER 2011)

Dr. Daugherty referred Plaintiff to Jefferson City Medical Group – Orthopedics and Sports Medicine (JCMG Orthopedics and Sports Medicine) to examine and treat her left shoulder pain.  On July 26, 2011, Plaintiff reported pain when moving her left shoulder in any direction.  (Tr. 734).  On August 23, 2011, Dr. Krautmann noted limited range of motion in her left shoulder but stated, "Testing of her range of motion is not as uncomfortable as it has been"; he refilled her Percocet prescription and recommended that she continue with exercises.  (Tr. 732-33).  On October 4, 2011, Dr. Krautmann stated that Plaintiff had increased elevation and "much less pain than [she] has had" and "much less pain at night"; he recommended that she continue doing exercises.  (Tr. 731).

On December 6, 2011, Dr. Krautmann noted that Plaintiff had pain and decreased range of motion in her right shoulder; he gave her Percocet and recommended exercises.  (Tr. 730).

### 7.  RECORDS OF COLUMBIA EYE CONSULTANTS (MARCH 2010)

On March 24, 2010, Plaintiff saw Dr. Edward Obermark, O.D., for the first time.  She reported that her vision had been decreasing for several months.  It was noted that Plaintiff had glasses but had not brought them with her.  Dr. Obermark reported Plaintiff's vision without

correction was 20/50 in the right eye and 20/70 in the left. With "cyclopegics using superimposed spheres," she had 20/25 vision in both eyes. Dr. Obermark noted that Plaintiff did not need treatment for diabetic retinopathy, but that she needed better blood sugar control. He recommended follow-up in six months. (Tr. 722).

### 8. RECORDS OF UNIVERSITY HOSPITAL AND CLINICS AND MASON EYE INSTITUTE (AUGUST - SEPTEMBER 2011)

On August 16, 2011, Plaintiff was admitted to University Hospital and Clinics, complaining that she had been experiencing "black floaters" in her eyes for a few weeks and had temporarily lost vision the day before. Plaintiff reported she could only see "outlines" of objects. The treating physician noted Plaintiff's vision in her right eye was 20/100 and that her vision in her left eye was "CF 2 ft."[19] (Tr. 667). Plaintiff was diagnosed with proliferative diabetic retinopathy in both eyes, vitreous hemorrhage (both eyes), and retinal traction (left eye). (Tr. 682).

On August 25, 2011, Plaintiff underwent surgery on both eyes. (Tr. 682-83). At a follow-up visit on September 13, 2011, Plaintiff's vision remained at 20/100 in her right eye, and she could see only "hand motion" in her left. (Tr. 675).

### C. OPINION EVIDENCE AND CONSULTATIVE EXAMINATIONS

#### 1. EVALUATION OF EXAMINING PHYSICIAN BARRY BURCHETT, M.D.

On July 17, 2010, Dr. Barry Burchett, M.D., performed a physical evaluation of Plaintiff. (Tr. 421-27). Dr. Burchett noted that Plaintiff had 20/40 vision in both eyes, with corrective lenses. (Tr. 423). Examination of Plaintiff's upper extremities revealed that Plaintiff's shoulders, elbows, and wrists were non-tender. Dr. Burchett found no abnormalities in the

---

[19] Plaintiff states that this is a way of measuring vision for people with worse than 20/400 vision and that it indicates that Plaintiff was able to "count fingers" at 2 feet.

cervical or dorsolumbar spine. (Tr. 424). There was "some falling of the metatarsal bases in the mid four third of the right foot" and Plaintiff was "unable to stand on the right foot and was unable to walk on her right toes." (Tr. 425). However, she ambulated with a normal gait and appeared stable at station and comfortable in the supine and sitting positions. (Tr. 423). Her ranges of motion in her joints were normal. (Tr. 426-27). Dr. Burchett diagnosed Plaintiff with (1) poorly controlled insulin dependent diabetes; (2) bilateral hammertoes (right worse than left); (3) goiter; (4) GERD; (5) probable diabetic gastroparesis; and (6) hypertension. (Tr. 424).

### 2. EVALUATION OF EXAMINING PSYCHOLOGIST PAUL REXROAT, PH.D. (MAY 2010)

On May 17, 2010, Paul Rexroat, Ph.D., performed a psychological evaluation of Plaintiff. (Tr. 416-20). He noted that Plaintiff was functioning in the average range of intelligence and that her symptoms of bipolar disorder and panic disorder "appear to be well controlled with medications." He found that Plaintiff could understand and remember simple instructions; could sustain concentration and persistence with simple tasks; had mild limitations in the ability to interact socially when on medications and moderate limitations when not on medications; and could adapt to her environment. (Tr. 418). He diagnosed Plaintiff with bipolar disorder and panic disorder without agoraphobia and assigned a GAF of 55. (Tr. 419).

### D. VOCATIONAL EVIDENCE

Vocational Expert ("VE") Delores Gonzales testified before the ALJ. (Tr. 42). The ALJ described a hypothetical claimant as follows:

> We've got a hypothetical claimant, aged 45 at the alleged date of onset; 10 years of education; some past work experience. It's been opined that this hypothetical claimant can lift and carry 20 pounds occasionally and 10 pounds frequently; requires a sit-stand option where she can change positions at will; can occasionally climb stairs and ramps, never ropes, ladders, and scaffolds; occasionally stoop, kneel, crouch, and crawl; should avoid concentrated exposure to fumes, odors, dusts, and gases, and hazards of unprotected heights.

In addition, this hypothetical claimant is able to understand, remember, and carry out at least simple instructions and non-detailed tasks; can respond appropriately to supervisors and co-workers in a task oriented setting, where contact with others is casual and infrequent; should not work in a setting which includes constant or regular contact with the general public; should not perform work which includes more than infrequent handling of customer complaints.

(Tr. 43). The VE testified that such a claimant could not return to Plaintiff's past work but could work as a mail clerk and sticker. (Tr. 43-44). However, the VE acknowledged that such a claimant could not work as a mail clerk if she could not read and could not work as a sticker if she could not see what she was doing. (Tr. 45-46).

### III.   STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *McCoy*, 648 F.3d at

611.  At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611.  At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings").  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the rest of the five-step process.  20 C.F.R. §§ 404.1520(d), 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations."  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e), 416.920(e).  At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work.    20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611.  If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.*  At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV.    DECISION OF THE ALJ

Applying the five-step analysis, the ALJ here found that Plaintiff had not engaged in substantial gainful activity since January 1, 2008, the alleged onset date. (Tr. 10). He found that Plaintiff had the following severe impairments: obesity, diabetes mellitus with retinopathy, hypothyroidism, hammer toes, mild chronic obstructive pulmonary disorder ("COPD"), depression, anxiety, impulse control issue, tendonitis of the left shoulder, and degenerative disc and joint disease of the lumbar spine. However, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 11). He found that Plaintiff had the following RFC:

> [T]he claimant has the residual functional capacity to perform light work (lifting and carrying ten pounds occasionally and 20 pounds frequently[20]; sitting at least six hours out of eight (as defined in 20 CFR 404.1567(b) and 416.967(b)) except that she requires a sit/stand option allowing her to change positions at will. She may occasionally climb stairs and ramps, but never ropes, ladders, or scaffolds. She should avoid concentrated exposure to fumes, odors, dust, and gases and unprotected heights. She can occasionally stoop, kneel, crouch, and crawl. She is able to understand, remember, and carry out at least simple instructions and non-detailed tasks. Respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is casual and infrequent. She should not work in a setting with constant/regular contact with the general public and should not work in a setting where she handles more than infrequent customer complaints.

---

[20] The RFC appears to contain a typographical error; the ALJ likely meant to state that she could lift ten pounds frequently and 20 pounds occasionally. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.").

(Tr. 13). He found Plaintiff unable to perform any past relevant work. (Tr. 16). Relying on the VE's testimony, the ALJ found that there were other jobs that exist in significant numbers in the national economy that the Plaintiff could perform. Thus, he concluded that Plaintiff had not been under a disability, as defined in the Act, from January 1, 2008 through the date of his decision. (Tr. 17).

## V.  DISCUSSION

### A.  STANDARD FOR JUDICIAL REVIEW

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "'If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

Plaintiff challenges the ALJ's decision on several grounds: she claims that the RFC assessment is not supported by substantial evidence; that the ALJ failed to develop the record with regard to certain treatment records from 2010 and 2011; that the ALJ failed to conduct a proper credibility analysis; and that the ALJ's finding at step five was not supported by substantial evidence because it was based on a faulty hypothetical question. The undersigned addresses each of these arguments in turn.

## B. THE RFC ASSESSMENT

Plaintiff argues that the RFC assessment is not supported by substantial evidence. Specifically, Plaintiff contends that the ALJ failed to obtain medical evidence addressing Plaintiff's ability to function in the workplace and that the ALJ failed to provide a proper narrative discussion explaining the reasons for his RFC findings. For the reasons stated below, the undersigned finds that the RFC was not supported by substantial evidence with regard to Plaintiff's physical abilities.

As discussed above, a claimant's RFC is "the most a claimant can do despite [the claimant's] limitations." *Moore*, 572 F.3d at 523. "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, RFC is a medical question. *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001). Thus, although the ALJ is not limited to considering medical evidence, "some medical evidence 'must support the determination of the claimant's residual functional capacity, and the ALJ should obtain medical evidence that

addresses the claimant's ability to function in the workplace.'" *Hutsell*, 259 F.3d at 712 (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).

Although Plaintiff's arguments appear to be specifically directed to the ALJ's assessment of her physical RFC, she does cite records of her mental impairments in her Statement of Facts. Therefore, the undersigned will address both the mental and physical RFC assessments.

### 1.    THE MENTAL RFC ASSESSMENT

The undersigned finds that the ALJ's assessment of Plaintiff's mental RFC is supported by substantial evidence in the record, including medical evidence. After reviewing Plaintiff's mental health records in some detail, the ALJ found that Plaintiff could understand, remember, and carry out at least simple instructions and non-detailed tasks; could respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others was casual and infrequent; should not work in a setting with constant/regular contact with the general public; and should not work in a setting where she handles more than infrequent customer complaints. (Tr. 13). This assessment largely echoes the findings of consultative examiner Dr. Rexroat, which the ALJ gave "great weight." (Tr. 16). Dr. Rexroat opined that Plaintiff had average intelligence and memory functioning, could understand and remember simple instructions; could sustain concentration, persistence, and pace with simple tasks, and had mild limitations in the ability to interact socially when she was on medications and moderate limitations when she was not on medications. (Tr. 416-19).

Although the opinion of a one-time consultative examiner, standing alone, generally does not constitute substantial evidence, *Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007), Dr. Rexroat's findings were also consistent with the other evidence in the record. For example, in June 2011, Plaintiff's treating physician, Dr. Daugherty, indicated that Plaintiff's anxiety and

depression were "well controlled" (Tr. 646). Similarly, Plaintiff testified at the hearing that her anxiety and depression are controlled by the medication "for the most part." (Tr. 36). The fact that Plaintiff's anxiety and depression were controllable with treatment indicates that they are not disabling. *See Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010) ("'If an impairment can be controlled by treatment or medication, it cannot be considered disabling.'" (quoting *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009)); *Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009) ("Impairments that are controllable or amenable to treatment do not support a finding of disability.").

## 2.    THE PHYSICAL RFC ASSESSMENT

Plaintiff argues that the physical RFC was not supported by substantial evidence because the ALJ failed to obtain "some medical evidence" addressing Plaintiff's ability to function in the workplace, as required by *Hutsell*, 259 F.3d at 711 , and *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). Defendant argues that there was medical evidence in the record that supported the ALJ's RFC assessment, citing the largely normal objective findings made by consultative examiner Dr. Burchett. In July 2010, Dr. Burchett found that Plaintiff walked with a normal gait; appeared stable at station; was comfortable in the spine and seated positions; had no shortness of breath with exertion; had a full range of motion in her shoulders, elbows, wrist, hips, knees, ankles, feet, and cervical and lumbar spine; had normal cervical spine and legs on examination; had normal straight leg raising; and could walk on her heels, perform tandem gait, and squat without difficulty. (Tr. 423-27). The ALJ indicated in his opinion that he gave "great weight" to these findings. (Tr. 16).

The undersigned does not agree with Plaintiff that because Dr. Burchett did not offer specific opinions about Plaintiff's ability to function in the workplace, Dr. Burchett's findings

cannot constitute the requisite "medical evidence" to support the RFC. It is true that Dr. Burchett did not offer opinions about Plaintiff's ability to "work" or to lift, stand, or walk on a regular basis during the workday. However, objective findings similar to those made by Dr. Burchett have previously been held sufficient to constitute "medical evidence" in support of a finding that a claimant can perform light or medium work, at least where other evidence in the record is consistent with the ALJ's conclusions. *See Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008) (upholding the ALJ's finding that the plaintiff could perform light work based on largely mild or normal objective findings regarding her back condition, despite the fact that the medical evidence was "'silent' with regard to work-related restrictions such as the length of time she [could] sit, stand, and walk and the amount of weight she can carry"); *Flynn v. Astrue*, 513 F.3d 788, 789 (8th Cir. 2008) (finding that physicians' observations that the claimant had normal muscle strength and mobility constituted medical evidence supporting the ALJ's conclusion that the claimant could lift 20 pounds occasionally and 10 pounds frequently); *Thornhill v. Colvin*, No. 4:12-CV-1150 (CEJ), 2013 WL 3835830, at *12 (E.D. Mo. July 24, 2013) (finding that medical records supporting the ALJ's statement that "physical examinations have been essentially unremarkable and reveal normal independent gait with no evidence of spine or joint abnormality or range of motion limitation or muscle tenderness" constituted medical evidence in support of a finding that the claimant could perform medium work). Thus, the undersigned does not find that remand is necessarily required based on a lack of "some medical evidence" in the record that addresses Plaintiff's ability to function in the workplace.

However, after reviewing the record as a whole, the undersigned cannot say that the RFC is supported by substantial evidence in the record as a whole, because the ALJ failed to consider significant evidence in the record that conflicted with the RFC assessment, including the

opinions and treatment notes of Plaintiff's treating physician. In his decision, the ALJ stated, "None of the claimant's treating sources submitted a medical source statement concerning her condition and assessing her ability to work." (Tr. 16). Although none of Plaintiff's treating sources submitted a formal medical source statement, Dr. Daugherty stated on three separate occasions (in November 2010, January 2011, and March 2011) that because of Plaintiff's chronic lumbosacral back pain, Plaintiff was "to avoid lifting greater than 10 pounds" and was to "avoid repetitive bending, twisting, turning motions." (Tr. 595, 653, 663). In addition, in May 2011, Dr. Daugherty stated that due to Plaintiff's left shoulder condition, she should do "no lifting with that arm until the MRI was reviewed." (Tr. 651).[21] These opinions appear to be inconsistent with the ALJ's RFC finding that Plaintiff could lift up to 20 pounds. Also, notably, these opinions were offered *after* the July 2010 consultative examination on which the ALJ relied.

Social Security regulations require the ALJ to consider medical opinions when assessing a disability claimant's RFC. *See* 20 C.F.R §§ 404.1527(b), 416.927(b). Medical opinions are statements from physicians, psychologists, or other acceptable medical sources that reflect judgments about the nature and severity of the claimant's impairments. *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). The ALJ may discount a treating physician's opinion if it is inconsistent with the physician's treatment notes or with the record as a whole. *Halverson v. Astrue*, 600 F.3d 922, 929-30 (8th Cir. 2010). However, "'[w]hen an ALJ

---

[21] Neither party discusses these statements in their briefs.

discounts a treating physician's opinion, he should give good reasons for doing so.'" *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) (quoting *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007)).

Here, it is undisputed that Dr. Daugherty was a treating physician; he began treating Plaintiff in 2003, and Plaintiff saw him and others in his office for treatment regularly throughout 2010 and 2011. The ALJ did not discuss the medical opinions of Dr. Daugherty at all, and it is not apparent that he considered them.

In addition, the ALJ discussed very few of Plaintiff's treatment notes related to her back and shoulder impairments, particularly those dated after Dr. Burchett's July 2010 examination. After Dr. Burchett's examination, Plaintiff was diagnosed with lumbar spine abnormalities by MRIs on two occasions (Tr. 479-80, 552); went to the emergency room for low back pain on multiple occasions (Tr. 486, 662); complained repeatedly of low back pain to her primary care physician (Tr. 578, 591, 595, 597-98, 600, 604, 653); was assessed by her primary care physician as having decreased range of motion in her torso secondary to back pain (Tr. 578); and was prescribed strong pain medications for her back pain, including Percocet, Vicodin, Flexeril, and Neurontin. (Tr. 489, 575, 595, 660, 663). Also after Dr. Burchett's examination, Plaintiff was diagnosed by MRI with mild to moderate tendonosis (Tr. 546); reported shoulder pain to her primary care physician on multiple occasions (Tr. 642, 645-46, 648-49, 651); was referred to an orthopedist and obtained treatment for her shoulder on several occasions (Tr. 731-34); was reported to have limited range of motion (Tr. 733); and was prescribed Percocet. (Tr. 732). The ALJ's entire assessment of the medical records regarding Plaintiff's back and shoulder pain was as follows:

> The claimant also has low back pain, which has been treated with motrin. (Ex. B1F/7).[22] She was diagnosed with mild to moderate lumbar spine spondylarthropathy and discogenic disease on an MRI dated July 27, 2010. On January 13, 2011, an MRI of her left shoulder showed mild inflammation mild to moderate tendonitis. (B10F/86). Her conditions are not serious enough to prevent her from working.

(Tr. 15). This analysis, which ignores Plaintiff's history of ongoing treatment with strong pain medications, Plaintiff's shoulder treatment by a specialist, and specific functional limitations imposed by Plaintiff's treating physician, leaves the undersigned unable to determine whether the ALJ adequately evaluated the medical evidence in the record regarding Plaintiff's back and shoulder impairments.

In sum, because it is unclear whether the ALJ properly evaluated the record, including the opinions and treatment notes of Plaintiff's treating physician, the undersigned recommends that the case be remanded. *See Anderson v. Barnhart*, 312 F.Supp.2d 1187, 1194 (E.D. Mo. 2004) ("Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand"); *Clover v. Astrue*, No. 4:07CV574-DJS, 2008 WL 3890497, at *12 (E.D. Mo. Aug. 19, 2008) ("Confronted with a decision that fails to provide 'good reasons' for the weight assigned to a treating physician's opinion, the district court must remand."); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). On remand, the ALJ should assess Dr. Daugherty's opinions under the appropriate regulations and explain the weight he gives to those opinions. The ALJ should also make it clear that he has reviewed all of the relevant medical records from Plaintiff's primary care physician and from other sources. In addition, the ALJ

---

[22] The cited page does not support this assertion. The ALJ may have been referring to a July 2009 record indicating that Plaintiff was treated with Motrin for back pain while she was hospitalized for mental impairments. (Tr. 278).

should also ensure that he provides a proper narrative discussion of how the evidence supports his conclusions, as required by Social Security Ruling 96-8p.

Plaintiff further argues that the ALJ's decision is internally inconsistent because the ALJ found at step two that Plaintiff had severe impairments of "tendonitis of left shoulder" and "diabetes mellitus with retinopathy" and yet failed to include limitations in the RFC that correspond to those impairments. As Plaintiff notes, a "severe impairment" is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). With respect to Plaintiff's left shoulder tendonitis, it is not clear that there is any inconsistency, because the RFC assessment did include lifting limitations that arguably accommodate Plaintiff's left shoulder impairment. However, the ALJ should clarify his findings with regard to Plaintiff's shoulder and lifting limitations after he reevaluates the medical records and opinions related to that condition.

With respect to Plaintiff's "diabetes with retinopathy," it does appear that there may be an inconsistency between the ALJ's step two finding, which indicates that this condition significantly limits Plaintiff's ability to do basic work activities, and his RFC finding, which does not appear to include limitations related to this impairment. However, the undersigned notes that to be disabling, an impairment must last or be expected to last for at least twelve months. *See* 42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A); *Barnhart v. Walton*, 535 U.S. 212, 218-19 (2002). The ALJ's conclusion that Plaintiff's visual problems did not satisfy the twelve-month requirement appears to be supported by substantial evidence,[23] and Plaintiff does not argue otherwise. Nevertheless, on remand, the ALJ should resolve the apparent inconsistency in his findings.

---

[23] On March 24, 2010, an opthamological examination appeared to indicate that Plaintiff had 20/25 vision in both eyes with correction. The doctor also stated that Plaintiff was not in need of treatment for diabetic neuropathy at that time. (Tr. 722).

## C.  FAILURE TO DEVELOP THE RECORD

Plaintiff also argues the ALJ's findings and conclusions are not supported by substantial evidence because he failed to fully and fairly develop the record regarding Plaintiff's medical treatment from 2010 and 2011.  Specifically, Plaintiff argues that the ALJ erred by failing to obtain any records from Plaintiff's treating endocrinologist; records of Plaintiff's surgeries for her thyroid, bladder, and gallbladder conditions; and records of Plaintiff's emergency room visits from 2010 and 2011.

It is a disability benefits claimant's burden, not the Commissioner's, to demonstrate the claimant's residual functional capacity (RFC).  *See Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010); *Stormo v. Barnhart,* 377 F.3d 801, 806 (8th Cir. 2004) (holding that the burden of persuasion to prove disability and demonstrate RFC remains on the claimant).  However, it is well settled that "the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case."  *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) (citing *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000) and *Landess v. Weinberger*, 490 F.2d 1187, 1188 (8th Cir. 1974)).  The ALJ's duty extends even to cases where the claimant is represented by an attorney at the administrative hearing.  *Id.* (citing *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983)).  "The ALJ possesses no interest in denying benefits and must act neutrally in developing the record."  *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 410 (1971) and *Battles v. Shalala*, 35 F.3d 43, 44 (8th Cir. 1994)).  However, reversal due to failure to develop the record is only warranted when such failure is unfair or prejudicial.  *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993).

For several reasons, the undersigned does not find that Plaintiff has established unfairness or prejudice that would warrant reversal for failure to develop the record in this case.

First, Plaintiff's suggestion that the ALJ himself believed the record to be incomplete is unavailing. As Plaintiff notes, at the hearing, the ALJ informed Plaintiff's hearing-level attorney that several categories of medical records were missing and that without those records it would be "impossible" for him to "fully evaluate" her claim, and he made similar statements in a follow-up letter. However, as discussed above, a review of the record reveals that the ALJ ultimately obtained most of the missing documents, including documents from each of the seven categories he identified as missing. These documents included records related to Plaintiff's eye problems, records of Plaintiff's shoulder treatment, and records of Plaintiff's regular visits to her primary care physician, with whom she regularly discussed her various conditions and surgeries.[24] There is no indication in the ALJ's decision that he believed that the record as it stood *at the time of his decision* was missing records that made it impossible for him to evaluate Plaintiff's claim. *See Haley v. Massanari*, 258 F.3d 742, 749 (8th Cir. 2001) ("'An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'") (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)).

Second, as Defendant observes, the ALJ did make significant efforts to obtain the missing records. The ALJ informed Plaintiff's counsel that medical records were missing from her file and requested them on three occasions: (1) at the hearing (Tr. 47-49); (2) by letter dated December 28, 2011 (Tr. 264); and (3) by letter dated February 29, 2012 (Tr. 266). Despite being given multiple opportunities to do so, Plaintiff's hearing-level counsel failed to obtain records from Plaintiff's endocrinologist or records regarding Plaintiff's thyroid, bladder, and gallbladder surgeries. This suggests that these records are of minor importance to the disability claim. *See*

---

[24] As discussed above, however, it is unclear whether the ALJ adequately considered these records, as he provided very little discussion of them.

*Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995) ("[T]he fact that [the plaintiff's] counsel did not obtain (or, so far as we know, try to obtain) the items [the plaintiff] now complains of suggests that these alleged treatments have only minor importance."); *Sullins v. Astrue*, No. 4:10CV1014MLM, 2011 WL 4055943, at *12 (E.D. Mo. Sept. 6, 2011) (refusing to remand for failure to develop the record regarding missing treatment records; reasoning in part that the fact that Plaintiff's counsel had not submitted the records suggested that they had only minor importance).

Third, Plaintiff does not explain how the missing records would have affected the outcome of the disability determination, which weighs against a finding of prejudice that would warrant reversal. *See Shannon*, 54 F.3d at 488 (refusing to remand based on failure to develop the record regarding missing records; reasoning in part that "the substance of [the plaintiff's] alleged other medical visits is unclear at best" and that the plaintiff "has not indicated that those visits should be regarded as dispositive for purposes of his claim"); *Owens v. Barnhart*, 109 F. App'x 825, 827 (8th Cir. 2004) (refusing to remand for failure to develop the record regarding missing records; reasoning in part that the plaintiff had not explained the legal significance of the records). The undersigned further notes that in her testimony, Plaintiff did not indicate that her thyroid, bladder, or gallbladder conditions interfered with her ability to work. She also did not mention her bladder or gallbladder conditions in her application for disability benefits. *See Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003) (noting that the ALJ need not investigate claims not alleged in the application of benefits).

In sum, the undersigned does not find that the ALJ failed to develop the record in a way that was unfair or prejudicial to Plaintiff. *See Onstad*, 999 F.2d at 1234. However, because the undersigned recommends that the case be remanded for other reasons and because it is unclear

whether the ALJ reviewed all of the records that were available to him, the undersigned recommends that the ALJ make it clear in his decision whether the record contains sufficient information for him to properly evaluate how Plaintiff's thyroid, bladder, and gallbladder conditions affected her ability to function.  If the ALJ believes that he does not have sufficient evidence, he should make additional efforts to obtain the missing records, contact Plaintiff's physicians, or obtain a consultative examination.

### D.  CREDIBILITY DETERMINATION

Plaintiff also challenges the ALJ's credibility determination.  When evaluating the credibility of a claimant's subjective complaints, the ALJ must consider several factors: "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints."  *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) and *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "'An ALJ who rejects subjective complaints must make an express credibility determination explaining the reason for discrediting the complaints.'"  *Id.* at 524 (quoting *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000)).  However, the ALJ need not explicitly discuss each factor.  *Id.* (citing *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005)).  It is sufficient if the ALJ "'acknowledges and considers the factors before discounting a claimant's subjective complaints.'"  *Id.*  The ALJ may not discount allegations of disabling pain solely because they are not fully supported by the medical evidence, but such allegations may be found not credible if they are inconsistent with the record as a whole.  *Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005).

As discussed above, the ALJ failed to address numerous medical records relevant to Plaintiff's impairments, including medical records indicating that she complained repeatedly to her physicians of back and shoulder pain, was treated with strong pain medications for that back pain, and was given functional limitations regarding that back pain by her physician. Those records are directly relevant to the credibility of Plaintiff's subjective complaints of disabling back and shoulder pain. On remand, the ALJ should reconsider his credibility findings in light of those records.

In addition, on remand, the ALJ should make it clear that he has considered all of the relevant credibility factors. In the decision under review, the ALJ did not cite *Polaski v. Heckler*, did not expressly discuss the required credibility factors in his decision, and did not make it clear how the facts he mentioned related to his assessment of Plaintiff's credibility. The ALJ did cite some evidence that is relevant to a credibility determination, including the fact that the records indicate that she lost her last job due to discord with her boss rather than back pain, the fact that some of her conditions (including her mental impairments and COPD) appear to be controlled by medication, and the fact that she was not always compliant with treatment recommendations for her diabetes. On remand, the ALJ should make it clear that he is assessing all of the relevant factors and should make clear the reasons for his credibility determination.

### E. THE ALJ'S HYPOTHETICAL QUESTION TO THE VOCATIONAL EXPERT

Plaintiff argues that the ALJ's finding at step five was not supported by substantial evidence because it was based upon the Vocational Expert's (VE's) response to a faulty hypothetical question that did not include all of the functional limitations produced by Plaintiff's impairments.

A hypothetical question to a VE "must capture the concrete consequences of the claimant's deficiencies." *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001). The question "'needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole.'" *Martise*, 641 F.3d at 927 (quoting *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006)); *see also Howe v. Astrue*, 499 F.3d 835, 842 (8th Cir. 2007) ("A hypothetical . . . need only include impairments that are supported by the record and that the ALJ accepts as valid.").

Here, the ALJ's hypothetical was based on his RFC assessment. As discussed above, the ALJ's RFC assessment does not appear to be supported by substantial evidence. Thus, the undersigned finds that the ALJ's hypothetical question based on that RFC did not constitute substantial evidence in support of his finding that Plaintiff could perform other work. *See Lauer*, 245 F.3d at 706 ("Because the hypothetical question posed to the vocational expert was based upon the faulty determination of [the plaintiff's] RFC, the vocational expert's answer to that question cannot constitute sufficient evidence that [the plaintiff] was able to engage in substantial gainful employment."). If the ALJ's RFC assessment changes on remand, he should present a hypothetical question that reflects all of the impairments and restrictions set forth in that RFC assessment.

## VI.    CONCLUSION

For the reasons set forth above, the undersigned finds that the decision of the Commissioner was not supported by substantial evidence. Accordingly,

**IT IS HEREBY RECOMMENDED** that decision of the Commissioner of Social Security be **REVERSED** and that this case be **REMANDED** under Sentence Four of 42 U.S.C.

§ 405(g) for reconsideration and further proceedings consistent with this Report and Recommendation.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of February, 2014.